Approved: _____
ELISHA KOBRE
Assistant United States Attorney

Before:   HONORABLE FRANK MAAS
          United States Magistrate Judge
          Southern District of New York

15 MAG  2595

- - - - - - - - - - - - - - - - x
                                 :   SEALED COMPLAINT
UNITED STATES OF AMERICA         :
                                 :   Violation of
        - v. -                   :   18 U.S.C. § 1343
                                 :
MARYSE LIBURDI,                  :   COUNTY OF OFFENSE:
    a/k/a "Maryse Thomas,"       :   NEW YORK
    a/k/a "Maryse Robinson,"     :
                                 :
             Defendant.          :
                                 :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MATTHEW J. GRADY, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

Count One

(Wire Fraud)

        1.   From at least in or about 2008 up to and including in or about January 2015, in the Southern District of New York and elsewhere, MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, wilfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, and attempting to do so, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, LIBURDI engaged in a scheme to obtain, retain, and convert to her own personal use, financial investments in a technology company controlled and operated by LIBURDI (the "Company") by, among other things, making false representations about the

1

Company's financial condition and manipulating the Company's bank accounts, and in connection therewith and in furtherance thereof, LIBURDI caused wire communications and wire transfers of funds to be sent in interstate commerce.

(Title 18, United States Code, Sections 1343 & 2.)

The bases for my knowledge and for the foregoing charge are, in part and among other things, as follows:

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been an FBI Special Agent for approximately four years and I am assigned to a White Collar Fraud squad within the New York Division. As part of my work at the FBI, I have received training regarding fraud and white collar crimes. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, including my examination of reports and records, interviews I have conducted, and conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, unless noted otherwise.

### OVERVIEW OF THE SCHEME TO DEFRAUD

3. As set forth below, MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, perpetrated a multi-year scheme to defraud individuals into investing millions of dollars in the Company, which was founded and run by LIBURDI. LIBURDI repeatedly made misrepresentations to investors about the Company's revenue and assets, manipulated Company bank accounts to hide the Company's true financial condition and, contrary to LIBURDI's express promises to the investors, converted hundreds of thousands of dollars of investor funds to LIBURDI's own use, including rent for LIBURDI's Manhattan apartment and to purchase luxury clothing and other personal items.

4. Contrary to representations by MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, to the investors, a review of the Company's bank records shows that, from at least 2008 until the Company ceased operating in January 2015, the Company earned little or no revenue. Instead,

as reflected in the Company's bank records, LIBURDI used investor funds for, among other things, LIBURDI's personal expenses and to repay investments by other investors. In order to hide her scheme, LIBURDI manipulated the Company's bank accounts by, on at least three occasions, writing checks for hundreds of thousands of dollars drawn on accounts with insufficient funds in order to fraudulently inflate the balance of a Company bank account and thereby hide the Company's true cash balance from the investors.

       5.  Through this scheme, MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, caused losses to at least four victim-investors totaling more than $6 million.

## **INFORMATION FROM VICTIM-INVESTORS IN THE COMPANY**

       6.  From speaking with an individual who invested in the Company based upon representations by MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, ("Victim-1"), reviewing documents provided by Victim-1, and reviewing Company records; I have learned, in substance and in part, the following:

       a.  Victim-1 first met LIBURDI in or about late 2009 or early 2010. In or about May 2010, LIBURDI called Victim-1 and told Victim-1 that LIBURDI wanted to raise capital for the Company. LIBURDI told Victim-1 that the Company was a digital advertising company that LIBURDI had conceptualized in or around 1997. LIBURDI told Victim-1 that the Company had a lot of money in the bank.

       b.  Victim-1 subsequently met on several occasions with LIBURDI in or about early to mid-2010. During these meetings, LIBURDI told Victim-1 that LIBURDI owned technology which was used to embed "hot spots" on items found in digital online videos such as clothing, jewelry, and other products. According to LIBURDI, users watching the videos on a computer or similar device would click on the "hot spots" and the user would be directed to information online about those specific products. The Company would make money from advertisers willing to pay for their products to be featured in this manner.

       c.  In or about May 2010, LIBURDI also physically provided Victim-1 with a Private Placement Memorandum concerning the Company dated April 2010. Among other things,

the Private Placement Memorandum, which I was provided by Victim-1 and have reviewed, stated that the Company "will use the proceeds of this Offering primarily to provide all or a portion of the financing needed for ongoing expansion, software production, development, distribution/streaming/hosting, human resources, marketing operations and public relations in the next stages of expansion."

    d.  On or about May 16, 2010, LIBURDI met with Victim-1 at a restaurant in Manhattan.  LIBURDI told Victim-1 that the Company was almost finished raising capital and that only $1 million remained to be raised.  Victim-1 told LIBURDI that Victim-1 wished to invest $1 million and an additional $350,000 on behalf of Victim-1's children.  Shortly after this meeting, Victim-1 provided a check to LIBURDI, payable to the Company, for $1,350,002.

    e.  In or about 2010, LIBURDI falsely told Victim-1 that the Company had $9.5 million in the bank, $12 million in revenues, and no debt.  In addition, prior to Victim-1's investment, LIBURDI falsely told Victim-1 that the Company had a value of $45 million.  As further described below, based upon my review of bank records for the Company, I know that these representations were false.  In particular, based upon my review of records from a particular bank based in Minneapolis, Minnesota (the "Minnesota Bank"), I have learned, among other things, that from in or about December 2007 through in or about August 2014, the Company maintained a bank account at the Minnesota Bank (the "Minnesota Company Account").[1]  Only LIBURDI had signature authority on the Minnesota Company Account.  Based upon my review of records for the Minnesota Company Account, I have learned that, from in or about 2008 until in or about May 2010, when Victim-1 invested in the Company as described above, the Company earned little or no revenue and that, in 2010, prior

---

[1] Based upon a search through the Financial Crimes Enforcement Network of the United States Department of the Treasury, the issuance of grand jury subpoenas, and interviews of Company employees, I believe that the Minnesota Company Account was the United States bank account that the Company used from in or about 2007 until in or about May 2012, when the Company began also using an account based in New York.  In addition, an attorney hired by LIBURDI to represent the Company ("Company Counsel") has represented to law enforcement that, in or about summer 2014, LIBURDI represented to Company Counsel that the Company did not have any foreign bank accounts.

to Victim-1's investment, the balance of the Minnesota Company Account never exceeded approximately $10,500.[2] From my interview of an individual who served as the Company's executive vice president beginning in or about the summer of 2012 and as the Company's interim Chief Executive Officer beginning in or about July 2014 (the "Interim CEO"), I have learned that the Interim CEO is aware of only approximately 6000 euros (approximately $6,500) in revenue earned by the Company.

            f.    On or about February 21, 2012, LIBURDI sent an e-mail to Victim-1 attaching a document titled "Quick Look – [Company] Reports Fourth Quarter and Fiscal 2011 Financial Results." I have reviewed this document. In this document, which states on the bottom of the first page "DRAFT 2012—not for circulation," LIBURDI states, in a letter "From the CEO" and signed by LIBURDI, that "[l]ast year was about growth and investment. Our revenues reached record highs. Our net income surpassed expectations." Another section of the document, titled "Q411 Financial Summary" states "Revenue was $7.3 million, an increase of 33% compared to $5.5 million in Q410." Based upon my review of records for the Minnesota Company Account – which I believe was the bank account used by the Company until in or about May 2012 – I have learned that, contrary to LIBURDI's representations, the Company earned little or no revenue during the fourth quarter of 2011 and the fourth quarter of 2010.

            g.    From my review of an e-mail exchange between LIBURDI and Victim-1, dated on or about May 16, 2012, I have learned the following, among other things. On or about May 16, 2012, Victim-1 sent an e-mail to LIBURDI stating, in pertinent part, "There is a substantial discrepancy that I am having trouble getting my hands around concerning the cash balances at the Company. In January 2011, per a meeting we had, you reported that there was approximately $10 million cash in the bank. In 2011, per the financials you showed us, there was EBITDA [Earnings before Interest, Taxes, Depreciation and Amortization]

---

[2] I have reviewed records for the Minnesota Company Account, including spreadsheets compiled by a forensic accountant working with the FBI (the "Forensic Accountant") based upon the Forensic Accountant's review of records for the Minnesota Company Account. Based upon this review, I have learned in substance and in part that, from at least in or about 2008 through in or about January 2015 when the Company ceased operating, the Minnesota Company Account received more than approximately $6 million in investments from victims and received little or no revenue.

5

of over $9 million . . . As a result, I was expecting to hear that there was $19-20 million in the Banks, but you said there was just over $4 million . . ." LIBURDI replied on the same day via e-mail stating, among other things, "[w]e had additional costs in recent months that are reflected in the updated financials for 2012 . . . which you will see in the report." Based upon my review of bank records for the Company, I know that in January 2011 the balance of the Minnesota Company Account was not approximately $10 million, as stated by LIBURDI to Victim-1, but rather always less than approximately $203,000 and that the Minnesota Company Account reflects little or no earnings.

        h.    On or about October 25, 2013, a Company shareholder meeting was held (the "October 2013 Shareholder Meeting"). The meeting was attended by, among others, LIBURDI, Victim-1, and another investor in the Company further described below. During this meeting, LIBURDI stated that the Company account held approximately $710,000 and produced a bank account statement as proof. From my review of records from a bank based in New York, New York (the "New York Bank"), I have learned that, on or about May 1, 2012, LIBURDI opened a bank account at the New York Bank (the "New York Company Account").[3] Based upon my review of records for the Minnesota Company Account and the New York Company Account, I have learned that on or about October 24, 2013, the day prior to the October 2013 Shareholder Meeting, LIBURDI wrote a check drawn on the Minnesota Company Account – which then had a balance of approximately $2,091.73 – payable to the Company, in the amount of $700,000, which was returned shortly thereafter for insufficient funds. As a result, the New York Company Account, which LIBURDI told Victim-1 had a balance of approximately $710,000, in fact had a balance of only approximately $10,702.78 at the time of the October 2013 Shareholder Meeting, and the bank statement LIBURDI displayed at the October 2013 Shareholder Meeting was materially misleading.

---

[3] I have reviewed records for the New York Company Account, including spreadsheets compiled by the Forensic Accountant for the New York Company Account. Based upon this review, I have learned in substance and in part that, from the opening of the New York Company Account through in or about January 2015 when the Company ceased operating, apart from rental payments received for space sublet by the Company, totaling approximately $126,661.74, the Company received little or no revenue in the New York Company Account.

     i. On or about June 10, 2014, another Company shareholder meeting was held (the "June 2014 Shareholder Meeting"). During this meeting, Victim-1 asked LIBURDI how much cash was available in the Company's bank account. LIBURDI replied approximately $400,000. Based upon my review of records for the Minnesota Company Account and the New York Company Account, I have learned that, on or about June 9, 2014, the day before the June 2014 Shareholder Meeting, LIBURDI wrote a check drawn on the Minnesota Company Account – which then had a balance of approximately $639.20 – payable to the Company, in the amount of $450,000, which was returned for insufficient funds the day following the meeting. As a result, the New York Company Account, which LIBURDI told Victim-1 had a balance of approximately $400,000, in fact had only approximately $5,019.23 at the time of the June 2014 Shareholder Meeting, and LIBURDI's representation that the Company's bank account had a balance of approximately $400,000 at the time of the June 2014 Shareholder Meeting was materially misleading.

     j. In or about July 2014, Victim-1 learned from another employee of the Company that checks for the rent of the Company's New York office and payroll had bounced. In or about July 2014, Victim-1 spoke with LIBURDI about these developments. LIBURDI stated that she was applying for a second mortgage on her home for approximately $230,000 to pay the rent and payroll expenses. Based upon my review of records of the New York Company Account and a bank account belonging to LIBURDI (the "Personal Account"), I have learned that, on or about July 25, 2013, LIBURDI wrote a check drawn on the Personal Account – which then had a negative balance – payable to the Company, in the amount of $230,000, which was returned days later for insufficient funds.

    7. From speaking with another individual who invested in the Company based upon representations by MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, ("Victim-2"), reviewing documents provided by Victim-2, and reviewing Company records, I have learned, in substance and in part, the following.

     a. Victim-2 first met LIBURDI in or about 1997. In or about 2002, LIBURDI asked Victim-2 for a loan to the Company. LIBURDI told Victim-2 that the Company's funds were tight and additional capital was needed to continue operations. LIBURDI stated that the funds would be used for the Company's business operations. From 2002 through 2013, Victim-2 provided several loans to the Company totaling between about $900,000 and

7

$1 million. These loans were made, at LIBURDI's direction, via wire transfer from, among other places, a bank account belonging to Victim-2 in Manhattan, to a now closed bank account in Minneapolis, Minnesota. Only a small portion of these loans has been repaid.

      b. LIBURDI told Victim-2 on multiple occasions that LIBURDI never took a salary from the Company. LIBURDI stated that she supported herself through several other businesses LIBURDI owned or operated including a travel agency, a cement company, and a company which manufactures screens on the back of airplane seats. From my review of LIBURDI's individual tax records, obtained via court order from the Internal Revenue Service, I have learned that LIBURDI reported little or no income for tax years 2008 through 2013.

      c. In or about September 2013, Victim-2 attended a Company board meeting which was also attended by, among others, LIBURDI and Victim-1. At this meeting, which occurred in New York, New York, Victim-1 asked LIBURDI how much cash the Company had access to. LIBURDI told Victim-1 $700,000 and showed the group a bank statement illustrating the amount. Based upon Victim-1's description of the October 2013 Shareholder Meeting and bank records from October 2013 reflecting the $700,000 check returned for insufficient funds, I believe that this board meeting described by Victim-2 was, in fact, the October 2013 Shareholder Meeting described by Victim-1 during which LIBURDI falsely represented that the balance of the New York Company Account was approximately $700,000.

      d. I have also reviewed an e-mail, provided by Victim-2, sent on or about October 25, 2013 from "Maryse Thomas," – which I know from among other sources, other e-mails sent by LIBURDI, was LIBURDI's prior married name – to another employee of the Company containing a "Financial Report" and "Financial Position" for the Company. The "Financial Report" states, among other things, that "Total revenue of $5,873,441.00 was generated for the year ended 31 December 2012 [(2011: (4,178,940)]." The "Financial Position" section states "Our current cash balance is $710,561.73." As described herein, based upon my review of bank records for the Company, I believe these statements are false.

      e. I have reviewed a document titled "[Company] Consolidated Financial Statements December 31, 2012 and 2013" (the "Company Financial Statement") provided to law enforcement by Victim-2. The Company Financial Statement contains a

narrative portion signed by LIBURDI and another section contains the Company's "Fiscal 2013 Financial Highlights," which states "Revenue in 2013 was $35,474,513.00, compared to $15,390,883 in 2012." A section of the Company Financial Statement titled "January-December 2013" states, among other things, that the "Total Income" during this period was "$8,446,255.84.". As described herein, based upon my review of the Company's bank records, which reflect little or no revenue or income, I believe that these statements were false.

        f. In or about July 2014, during a conference call between LIBURDI, Victim-1, and Victim-2, among others, Victim-2 asked LIBURDI why LIBURDI was bouncing checks from the Company's bank account. LIBURDI stated that she would provide an answer but not at that time. During the same conference call, LIBURDI resigned as the Company's Chief Executive Officer. However, based upon my interview of a managing director of a particular investment firm from which LIBURDI sought an investment in the Company (the "Investment Firm"), and documents provided by the Investment Firm, I have learned that LIBURDI falsely continued to represent herself to the Investment Firm as CEO of the Company.

        8. From speaking with another individual who invested in the Company based upon representations by MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, ("Victim-3"), reviewing documents provided by Victim-3, and reviewing Company records, I have learned, in substance and in part, the following:

        a. Victim-3 first met LIBURDI in or about 2005. LIBURDI told Victim-3 about the Company including, among other things, that funding was needed to get the Company up and running and to grow the Company.

        b. In or about late 2008 or early 2009, LIBURDI told Victim-3 that a new valuation of the Company would soon occur and that Victim-3 should invest before the new valuation. LIBURDI told Victim-3 that Victim-3's investment would be used for the Company's business operations. In or about December 2008, Victim-3 provided LIBURDI with an investment of approximately $250,000 in the Company.

        c. In or about November 2014, Victim-3 learned from Victim-2 that a forensic accountant hired to review the Company's financial records and accounts had determined that the Company accounts had no funds.

...

**FINANCIAL ANALYSIS OF THE COMPANY'S BANK RECORDS**

9.   Based upon my review of records for the Minnesota Company Account and spreadsheets compiled by the Forensic Accountant based upon the Forensic Accountant's review of records for the Minnesota Company Account, I have learned that MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, converted to her own use through withdrawals and personal expenditures, hundreds of thousands of dollars of investor funds that LIBURDI had promised the victims would be spent to further the business of the Company.  For example, I have learned, among other things, the following:

a.   On or about May 16, 2010, the day Victim-1 provided LIBURDI with an investment in the Company of approximately $1,350,002.00, the balance of the Minnesota Company Account was approximately $3,000.  From on or about May 16, 2010 through on or about May 16, 2011, only approximately $24,220 was added to the account.  During the same one-year period, LIBURDI made the following approximate withdrawals and expenditures, among others, from the Minnesota Company Account: $174,191.65 in cash withdrawals; $127,460 via transfers to another apparently personal bank account in the name of LIBURDI and her then husband; $72,000 in rental payments for a three-bedroom Manhattan apartment which I know, based upon records provided by the property management company for the apartment, was leased to LIBURDI ("LIBURDI's Manhattan Apartment"); $46,778 in payments for personal credit cards jointly and individually in the name of LIBURDI and her ex-husband; and substantial personal expenditures on three corporate credit cards, two of which were in the name of the Company and the third in the name of a predecessor company (the "Company Credit Cards") including, among other things, at least approximately: $6,000 at salons and spas; $6,800 at wine and liquor stores, and approximately $62,000 at various retail clothing, accessories, and cosmetics stores.  In addition, during the same period, LIBURDI paid approximately $200,000 of Victim-1's investment to prior investors in the Company.[4]

b.   Beginning in or about December 2011, when the balance of the Minnesota Company Account was approximately

---

[4] From my review of a statement for one of the Company Credit Cards, I have learned that, in or about September 2011, approximately $28,767.61 in charges on the card were assigned to a collection agent and therefore cancelled.

10

$15.03, members of a group of investors (collectively "Victim-4") invested approximately $4 million in the Company. During the period from in or about December 2011, when investors from Victim-4 began providing money to the Company into the Minnesota Company Account, through August 2014, when the Minnesota Company Account was closed, aside from funds provided by Victim-4 and another investor, only approximately $200,000 was added to the Minnesota Company Account. During the same period, LIBURDI made the following approximate withdrawals and expenditures, among others, from the Minnesota Company Account: $206,410 in cash withdrawals; $1,157,860.34 via transfers to personal bank accounts in the name of LIBURDI or accounts held jointly by LIBURDI and her then husband; $187,568 in rental and utility payments for LIBURDI's Manhattan Apartment; and $258,364.48 in payments for personal credit cards in the name of LIBURDI. In addition, during the same period, LIBURDI paid approximately $120,000 of Victim-4's investments to prior investors in the Company.

      10. Based upon my interview of a particular individual engaged in tax preparation (the "Tax Preparer"), and based upon e-mail correspondence between MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, and the Tax Preparer, I have learned, in substance and in part, the following:

      a. In or about 2012, LIBURDI told the Tax Preparer that LIBURDI had a business, the Company, for which tax returns needed to be prepared and asked the Tax Preparer to complete the returns.

      b. LIBURDI, LIBURDI's assistant, and an individual represented to the Tax Preparer to be the Company Chief Financial Officer, who was in fact LIBURDI's ex-husband, provided the Tax Preparer, who had no independent knowledge of the Company's finances, with documents and information to complete the tax returns. From my review of an e-mail sent by LIBURDI to the Tax Preparer on or about June 29, 2012, I have learned that LIBURDI told the Tax Preparer that the Company had $7 million in cash in the first quarter of 2012. Based upon my review of records for the Minnesota Company Account and the New York Company Account, I believe this was false.

      c. In or about March 2013, the Tax Preparer sent completed tax returns to LIBURDI (the "Tax Returns") but did not file the returns.

d.  Based upon my review of the Tax Returns for the Company provided to law enforcement by the Tax Preparer, I have learned, among other things, that a corporate tax return prepared by the Tax Preparer for tax year 2010 listed the Company's gross receipts as $11,144,514 and gross profit as $5,572,257, and that a corporate tax return prepared by the Tax preparer for tax year 2011 listed the Company's gross receipts as $39,711,521 and gross profit as $19,855,760.  However, as noted above, based upon my review of the Company's bank accounts, including the Minnesota Company Account and the New York Company Account, I believe that from approximately January 2008 through approximately August 2014, the Company received little or no revenue.

11.  I believe that one or both of the fraudulent tax returns provided by the Tax Preparer to MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, were subsequently provided to accountants working for Victim-1, Victim-2, and a landlord for the space leased by the Company for the purpose of perpetuating the fraudulent scheme.  In particular, an accountant working for Victim-1 and a landlord for the space leased by the Company each provided me with tax returns for the Company for tax years 2010 and 2011 that appear the same as those provided by the Tax Preparer to LIBURDI. Moreover, Victim-2 provided me with a copy of the Company's tax return for tax year 2011 that appears to be the same as the return provided by the Tax Preparer to LIBURDI.[5]

12.  Based upon my review of documents provided by the Internal Revenue Service ("IRS") pursuant to a court order, I have learned that the IRS has no record of the Company being established until 2011 and that no tax returns were filed for the Company for tax years 2011 through 2013.

---

[5] The Company tax returns provided to the victims and the landlord appear to differ from those provided by the Tax Preparer to LIBURDI only with respect to the dates on the returns which appear to be the result of the date being automatically changed to the date of printing.

WHEREFORE, deponent prays that an arrest warrant be issued and MARYSE LIBURDI, a/k/a "Maryse Thomas," a/k/a "Maryse Robinson," the defendant, be imprisoned or bailed, as the case may be.

*[signature]*
MATTHEW J. GRADY
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
27th day of July 2015

*[signature]*
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK